May I proceed, Your Honor? Yes. Good morning, Your Honors. Bill Richards with my co-counsel Andrew Roszynski on behalf of the appellant Mark Tauscher, who is also available here at council table, and I appreciate the opportunity that you've allowed him to be there. May it please the Court, the Court must reverse the decision of the District Court to grant summary judgment to the Phoenix Association of Realtors because, first, it rests upon the erroneous factual conclusion that Mr. Tauscher somehow refused to discuss with the association alternative accommodations to an ASL sign language interpreter. Second, because the Court's decision also ignored the association's own duties under the ADA and the parallel state law provisions to actually affirmatively offer accommodations that would allow Mr. Tauscher to have effective communication in their interactive classroom setting. Can I ask a question? Yes, Your Honor. Is he a realtor or has he got a full-time job someplace else? Yes. And if he is one or the other, does it make a difference in how the case proceeds? Yes, Your Honor. It does make no difference, Your Honor, but yes, he does have a full-time job elsewhere. So he does his realty agency work on the side as a second job, which is not uncommon among real estate agents, at least in Arizona. And he did not ‑‑ this does not involve an employment situation, a Title I type of situation. It is a Title III public accommodation setting. Therefore, whether it's his first job, primary job, second job, or simply a hobby that is benefited by a public accommodation, it doesn't make any difference. The Title III requirements for the association are all the same. So my question is, I probably know the answer to my question, but when you're looking at the issue of a burden that might be claimed, is it in calculating that balance do you take into account? I mean, if he's a full-time realtor, that might be one thing. If he's just doing it once a year, does that make a difference in how they measure the burden and what is reasonable? Your Honor, respectfully, the answer is no. It should not make any difference for these reasons. Number one, they do not offer these classes just to people who make themselves full‑time realtors. They offer them to anybody who is a licensed Arizona realtor and who requires the same 24‑hour credits that everyone else requires every two years in order to keep your license current. So whether you're doing it full‑time, one day a week, you know, an hour a week, it doesn't matter. You still have the same continuing education obligations, and they're offering the same services to everybody. In addition, Your Honor, if that were the test, then you would simply have a real problem with the It may be that Mr. Tauscher is not a full‑time realtor now, but he wants to be a full‑time realtor, and one of the ways he wants to get there is by learning how to be a better realtor through the many courses that are offered by this organization, and particularly through the interactive courses where he gets to go, and as they advertise and market it, he gets to go and network with fellow real estate agents, which is obviously important to building that business into potentially a full‑time occupation. He gets to also learn from other people with experience in our local community about how they handle situations that may come up in his practice, and therefore, if you cut it off and say, well, it's one test for those people who really have a vested full‑time job interest in the service versus those who may be at the front end of that or, you know, may be trying to break into that, it would be an impossible standard to apply. In fact, it would be an unfair standard to apply, because that would mean, then, that you have an undue burden that would ‑‑ defense that would particularly harm those people who are trying to break into the business. Your Honors, as you saw from the Court's findings, the Court decisions actually below rested pages 3, 4, and 5 of the Court's original summary judgment decision and also in its denial of our motion for reconsideration on the finding that Mr. Tauscher actively resisted and, quote, refused to discuss alternative auxiliary aids. Is it correct that he took the position that only a sign language interpreter would be adequate? That's the position that was taken by the realtors? Your Honor, he took the position that given the unique circumstances of this particular type of coursework and the way they had it set up, the way they advertised it, and the way that he learned and communicated, that an ASL interpreter was an effective means of communication for him and that the few alternatives that they discussed with him were not effective communication alternatives. So to suggest ‑‑ So he offered that up and rejected all of the ones that they suggested. Is that correct? Well, Your Honor, I think it's important. There's a nuance here. Is that correct? Is that what happened? Your Honor, I wouldn't say he rejected as much as he told them that those were not acceptable because they wouldn't provide effective communication. So he said the only one that would be effective that he presented was the interpreter. Well, Your Honor, yes, of the ones that they discussed. And I think it's important, Your Honor, to reflect on what was actually discussed with him. They spent an awful lot of time in their brief discussing this captioning, realtime captioning, or CART option. But the record is very clear. The CEO testified that she investigated that and she made the decision early on that that was too expensive. I thought he said it wouldn't work for him anyway. He did. So it's sort of irrelevant if they didn't offer it. And Your Honor, exactly. And so that was my point exactly. I don't need to belabor that, that it was irrelevant. It's irrelevant to this decision. It wasn't going to be offered. He didn't believe it was going to be effective. And they would never have offered it in the first place. So it's completely irrelevant. What they did discuss was an FM loop, which is an amplification system, one where it's on the ear, not going to work for someone who's profoundly deaf. They discussed a lip reading option. Again, he very carefully and professionally explained to them why lip reading was not acceptable. So standing here today, are there other options that would be effective communications that perhaps Mr. Towsher didn't mention, but that you can say now would be effective other than the sign language interpreter? Your Honor, not that he is aware of. And I think he concedes that, that he... So it is, in fact, the only effective means of communication. For that particular type of coursework, the interactive classroom, yes, Your Honor, it is. Particularly because that sort of experience, and of course the law requires that he be given an equal opportunity to gain the same benefits of the experience that's being offered to non-disabled individuals. The experience that's being offered includes interacting. It includes asking live questions of a very skilled, knowledgeable instructor, and asking questions of and commenting upon comments made and questions asked, and experiences shared by the other members of the class, experienced realtors. So in... So opposing counsel says, in discussing whether that would be an undue burden, they discuss an Eighth Circuit case, kinder care, which says if you incur a weekly... The kinder care is concerned about... They said that was enough to make it an undue burden. So do you want to discuss or explain what factors we should consider as to undue burden or is something that the district court... Is something for a district court, assuming we agree that the interactive process is not the key? Yes. And Your Honor, I will address kinder care. Kinder care is a very different situation and I'm happy to discuss the undue burden standard and factors in this particular case. Kindergarten is your... Kinder care, excuse me, as you'll recall, involved a for-profit entity that was set up corporately so that it lived or died by its own particular small budget in that particular school. That is not the situation here. But if the parent company... I mean, that's their... That's the way they ran it, but that doesn't mean that the parent company doesn't have excess funds. So that was struck as irrelevant and they just looked at the specific school in that decision. And Your Honor, here there's not a segregation. There is not a school per se. There is the Phoenix Association of Realtors and one of the services they provide is the school, but it's not segregated. There was not evidence that it has its own separate budget that is limited to siloed somehow and can't access other funds. In fact, Your Honor, I think for the undue burden situation or question in this case, the court need... Didn't have to go any further than looking at the actual testimony of the individual they identified as the person who could speak to the undue burden, which was the CEO, Ms. Shearer. And she testified, and Your Honor, I would refer the court to her testimony at... This is excerpt of records 0726 through 0728, and she specifically testified that even in 2016, this is several years after Mr. Tauscher had attempted to get services, and as she was were declining, that the organization still had over $100,000 in reserve funds. And is that the test? Because they also testified that the cost of the education program was in the red consistently during that period. Yes. So is there anything that says a court shouldn't look at whether the service itself is in the red, their educational service? I don't know if there's anything that says that specifically, but the authority clearly says that you should examine, and the courts have to examine, the full financial resources and abilities and options available to the organization. It doesn't really tell us how to balance them, at least the regulations don't. I didn't see a case in our circuit that provides guidance. And with all due respect, in this particular case, I don't know that the court has to even get to the standard per se, because Ms. Shearer testified when I asked her, could you have afforded the $360 for the three-hour class that he applied for in 2014? She said even then in 2016, yes, we could. Do you think that's the test, just whether a company could have paid for it, had the funds to pay for it, or do you think that undue burden suggests that the burden was undue whether they had the funds or not? Well, Your Honor, I don't know that it's the only part of the test, but it certainly is dispositive in this case. Why is it dispositive in this case? Well, because they didn't show any actual burden, Your Honor, that was undue. They showed that their service was in the red, right? There was testimony to that, in fact. Well, Your Honor, they showed that, they claimed that the service on the particular courses was in the red, but of course, that's an issue also within their control. In many respects, they had 9,000 members. I think one thing we pointed out in the record was they could have increased dues by a dollar a person and had three times what they needed for all 24 hours of Mr. Tauscher's interpreting services. I mean, there were many things they could do, but they didn't need to do any of those things because the record made it clear. They had these excess funds, and they indicated, look, they wouldn't have gone into the red as an organization providing his communication services for many years in the future, and that is presuming that Is there any case that says that that's the standard? Because all I saw was kindergarten care, which suggests that's not the standard. So what's your best case supporting that? Your Honor, I apologize. I don't have the cases to cite you, but I think that overall the authority we provided indicates that it is a burden issue, looks at the entire set of resources that the organization has available to it at the time, and doesn't focus simply on whether a particular program is in the red, whether you're making more off of this particular program than you would have to pay out in services. And the example, Your Honor, and I know it's not right on point, but if the association's argument holds, well, then a restaurant could say, you know what, we don't have to build that handicapped accessible ramp for people in wheelchairs, because a ramp is always going to cost more than it costs or they're going to pay for their meal, right? The stake of costing $20 is never going to make back what this ramp is going to cost. That's not the test, however. The test is whether there's a true undue burden. Your Honors, I see my time is closing, and I wanted to save a little bit for rebuttal. I hope I've answered your question. The final point I make, Your Honors, we have suggested to the Court that it would be appropriate to actually grant summary judgment in Mr. Tauscher's favor. In reality, the ADA and the Arizona Act require an organization like the Phoenix Association of Realtors, as a public accommodation, to actually offer some alternative that provides effective communication. They didn't do that. The only thing they've sort of a captioning issue. Certainly, whether that would provide effective communication is highly disputed in the record, but they didn't offer that, and they said they would never offer it. They made a decision it was too expensive. So they failed. They failed in their duty. They can't establish that they met their duty to offer any form of appropriate accommodation. That's all I have, Your Honors. I'll save my last minute for rebuttal. Thank you.  Thank you, Your Honors. May it please the Court, Brian Howey from Florals and Brady for Defendant Appalee, Phoenix Association of Realtors. I'll refer to them as par during the course of my argument. Your Honors, I'd like to start with the interactive process requirement and Judge Logan's ruling that Mr. Tauscher, correctly, Judge Logan ruled that Mr. Tauscher failed to engage in the interactive process with par when he refused to consider any auxiliary aids other than an ASL interpreter. So this is a Title III claim, and the interactive process is in Title I. What case do you have that says the interactive process requirement applies in this kind of case? Your Honor, the two cases that we cited in our briefs, Vinson v. Thomas and Enriching v. City of Fountain Valley, both of those are Title II cases, but this Court has placed them. Well, you don't have a Title III case, do you? I believe, Your Honor, that in Enriching, the Court cited to prior Ninth Circuit case, Barnett v. U.S. Air, which was reversed on other grounds by the Supreme Court. The parenthetical in Enriching says that Barnett applied the interactive process requirement in a Title III case. We also cited a case from the Third Circuit that Schneider v. Shaw, which said that there was an obligation to engage in an interactive process geared towards providing reasonable accommodations. Our contention is that under the — Well, what's the argument as a matter of statutory interpretation? Because of the Eighth Circuit, Kester said, expressed some skepticism about that. So what's your statutory interpretation or argument that the interactive process applies in this kind of case? I would refer to 28 C.F.R. 36.303 C.1. Romanet 2. A public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication. But the ultimate decision rests with the public accommodation. That, to me, imposes on the public entity, in this case PAR, an obligation to engage in a discussion with the person with a disability. But the obligation has to be necessarily mutual. And in this case, Judge Logan correctly ruled that Mr. Tauscher came to PAR with an ultimatum. And the ultimatum was, I have a disability, I want a sign language interpreter, and you are obligated to give me the accommodation of my choice. Now, the way that the regulations are written, PAR, in that situation, does not have to give the person with a disability the auxiliary aid of his or her choice. Well, you have to go ahead, I'm sorry, go ahead, Judge. The regulation you just cited says that the method chosen has to result in effective communication. And wasn't his position that all those other options don't provide effective communication? That was his position, Your Honor. But as the Southern District of New York held in the Howard v. UPS case, the law doesn't require UPS to provide the accommodation plaintiff subjectively believes best serves his needs. Mr. Tauscher testified in his deposition that he was fluent in English and that captioning worked for him watching videos. He's well-educated, has a college degree, he has an MBA. If you look at the regulations, both 36.303 and 36.309, which applies specifically to an entity that provides an examination or a course, you'll see that the types of auxiliary aids that are identified as providing effective communication, in addition to a sign language interpreter, include things like written materials and captioning-type devices. But you didn't offer the captioning device, did you? We did not offer the captioning device, Your Honor. So of the accommodations you offered, which ones do you believe would have been effective? Your Honor, our position is that we never got to the point in the interactive process when we had the ability to offer additional alternatives. And the reason was that Mr. Tauscher said at the outset, I need a sign language interpreter, and he never backed off that position. If you look at his deposition, I'm sorry. Right. But then you said, well, here's some alternatives. He said, those don't work for me. And why isn't that? I disagree that he said that they don't work for him. What he said was, I would prefer a sign language alternative, a sign language interpreter. When we asked him in his deposition, would you be willing to consider any auxiliary aid other than a sign language interpreter? And, Judge Ikuta, you asked Mr. Richard that question. What Mr. Tauscher's answer was, I want a sign language interpreter. It was a preference. It wasn't that the context of this class and this communication meant that a sign language interpreter was the only way he could receive the information. Well, that's his argument today. Why isn't that a jury question? Well, in this case, Your Honor, the jury instruction that the Court upheld in City of Enriching, understanding that that is a Title II case, said that if a plaintiff or a person with a disability refuses to consider any alternatives other than his or her preferred form of accommodation, that alone obviates the need for the public entity or par in this situation to present reasonable accommodations, and it is fatal to the individual's ADA claim. Why isn't that a fact question? You say he refused. He said, no, they didn't offer anything that would work for me. And you say, well, we don't know. Why isn't that a fact question for a jury to determine whether or not he engaged in the interactive process, assuming that the interactive process is required under Title III? Your Honor, I would refer to ER 357 and 362. Those are pages from Mr. Tauscher's I think in that case, what you'll see is that Mr. Tauscher's position, however it's been articulated here today, his position at the time was, this is what I want, you have to give it to me. That's what he said to the AACRD, the Arizona Civil Rights Division, is they were required to give me a sign language interpreter. And the regulations suggest pretty strongly, based on the number of different types of auxiliary aids that are identified, that include things like note-takers. Right. I understand what you've identified, but in the context of this case, it appears that the only two methods of communication that would have worked would have been sign language or closed captioning. And you didn't offer either of those two. I think it's possible, Your Honor, that note-taking would have been sufficient. The Howard v. UPS case, which we cited in our briefs, is a very similar set of facts to this one. In that case, Mr. Howard, who was the plaintiff, wanted to be a delivery driver with UPS. UPS required that all its drivers take a six-day class. It was a live classroom setting, to use Mr. Tauscher's parlance, that it was an interactive live classroom. Mr. Howard said he wanted a sign language interpreter. Ironically enough, Mr. Howard was represented by the same counsel as in this case, the same expert that they used in this case. UPS said, no, we're not going to give you a sign language interpreter. We will give you other forms of accommodation, note-takers. We will give you the ability to talk to the instructor during breaks and ask questions, which was one of the things that Parr had offered here. In that case, the Southern District of New York granted summary judgment on the ADA claim for UPS and said, again, as I quoted before, they don't have to give the accommodation that plaintiff subjectively believes best serves his needs. In this case, we never got to the point where we were able to talk about whether providing written materials to Mr. Tauscher in advance, having a note-taker there with him. We did talk about his ability to ask questions of the instructor during breaks, other forms of captioning. Mr. Tauscher's position was, I want a sign language interpreter. I know what I need. I've been deaf for 50 years. I know that I need an interpreter. I know exactly what I need, and I need an interpreter. And the regulations don't allow a person with a disability to make an ultimatum of that sort. I will agree that there are probably other factual contexts in which this kind of issue could arise where it would have to be a sign language interpreter or nothing else. The Appendix C to Part 36 specifically addresses two of those scenarios. One of them would be medical advice and the need to be able to have exact, you know, specific communication with a medical professional, and another would be financial advice. But they don't allow a person with a disability to dictate to a public entity like PAR that this is the only accommodation that will be acceptable. Assuming that we think that Title III doesn't have the same sort of interactive process back and forth that Title I, II do, did PAR offer an effective communication? You were citing Howard. And if so, what do you think was the communication that PAR offered that was effective? Because the regulations indicate that the public I mean, the problem, Your Honor, is the initial things that we offered, the FM loop system and lip reading, then we started to talk about captioning. And Mr. Tauscher admitted in his depositioning that captioning works for him. He's obviously fluent in English and able to read captions. We never got to the point where we actually offered CART or another form of accommodation. I thought the evidence showed that there was a decision made not to offer it because of the expense of configuring it for a specific class. That was Ms. Scheer's testimony was that CART and the specific type of CART program or application that she had done some Google research on would be, she had determined that would be too expensive. But she never progressed further in her internal analysis and assessment of other accommodations. Again, because Mr. Tauscher's position was it doesn't really matter what else you present to me. At the end of the day, I know I'm going to need a sign language interpreter. So it's a little bit of a chicken and egg problem. I don't disagree that Title III imposes on an entity like PAR the obligation to offer an auxiliary aid that provides effective communication. But where the person with the disability is saying, well, I know what I need and none of these other things are going to work for me and the regulations and the cases interpreting them say that ultimately it's the entity's decision and allow for a number of other forms of auxiliary aids that don't provide an equal experience for a person with a disability. Can you address whether your position at providing an interpreter would have been an undue burden in light of the fact that you had the absolute resources necessary to pay for it? Yes, Your Honor. As we cited in the brief, the Roberts Kindergarten case is the one that's most directly on point. The evidence was undisputed in the record that as PAR's financial statement showed, PAR as an entity was operating at a loss in 2012, in 2013, in 2014, in 2015, and for the first eight months of 2016. In the KinderCare case, KinderCare, the operating center in question that was being asked to provide a full-time aid as an accommodation actually had an operating profit. Here, PAR was operating at a loss. And in KinderCare, the court evaluated the cost of the full-time aid, which was I think about $205, and the cost of the tuition and determined that the small operating profit that that center was operating under, it would be an undue burden. I think that's exactly applicable to these facts, where PAR as an entity is losing money. They're in the red. Not just the class activity, the whole organization is in the red year after year after year. And being asked to provide sign language interpreters that would probably range between $1,600 and $3,300 for a full-day course, the need to have two ASL interpreters, under the Roberts case, applied to these facts, providing that form of accommodation would be an undue burden. Why isn't that a jury question? It can be, Your Honor, except for the fact that I don't believe there's any dispute based on the PAR financial statements that the operating income of PAR was in the red. Their argument is that, well, there are other funds that you have, basically, if you have cash in the bank that could pay for the interpreter. Right. So why doesn't that create a jury question? You may well win the jury question, but why doesn't it create an issue of fact? I think it doesn't here, Your Honor, only because they don't dispute that we were operating in the red. They're focusing on a different line item of our financial statement, which is what cash do we have on hand. If they disputed that our accounting statements, that our financial statements were inaccurate, if they were disputing the accuracy of them and saying, actually, you guys are using creative bookkeeping and you're actually operating in the black, not in the red, then I agree that it would be a jury question. But they don't really... So are you suggesting that that's a bright-line rule, that if you're operating in the red for that particular period or business, they don't have to make the accommodation because it's an undue burden? I don't think I would say it was a bright-line rule just the way you formulated it, but the Kindercare case is pretty specific that on these types of facts where you're balancing the cost of the accommodation with the cost of the tuition and how the center itself is operating, that in that case, summary judgment is appropriate. And I think it's exactly what we contend would be the correct result here, even though Judge Logan didn't rule on the undue burden question in his order or in his order on reconsideration. Your time is nearly up. Do you want to sum up? Unless the Court has any other questions. Thank you. Thank you, Judge Ikuda. I didn't do a very good job of answering your question on the undue burden case law, so I went back and looked at the brief quickly, and I would simply invite your attention to pages 26 and 27 of our reply brief, where we cited a number of cases that explain the standards regarding the undue burden defense, and particularly the Updike decision from this circuit, as well as the, I'm going to massacre this, but Rhea Zuden v. Montgomery County, Searles v. Johns Hopkins Hospital, and of course the relevant statutory and regulatory provisions that we provided there, all of which indicate that the test cannot be the test that they are using here, the are we in the red, are we operating at a loss, because that allows, unfortunately that would allow people to use creative accounting to claim that they are operating currently at a loss and therefore they can't provide accommodations. So that is not the test. A couple of other quick points in rebuttal. Number one, there was no ultimatum. I would simply invite the Court to look at Mr. Tauscher's letter from March 1st of 2013. He didn't require that his choice only arbitrarily be honored. He explained why a interpreter was necessary and why other means of communication would not be effective, and one thing that he pointed out in particular was a real-time interpreter allows him to ask questions just like everybody else in the class gets to ask. He doesn't have to try and write out notes, stop everything, get someone to read them. He doesn't have to rely upon anything like that. He can simply act like everyone else in the class, and they market this class as beneficial for that point exactly. Finally, I would simply ask the Court to consider the fact that the organization never did engage in a real interactive process, irrespective of what the law requires that interactive process to be, and I'd encourage you to look at where their quotes come from, where they say they asked him to, or they told him they were open to talking about other free or less costly alternatives. Those come in letters from counsel that they hired to they come in two letters and an email, and every one of those communications starts off by saying we are not subject to the ADA and do not have to provide any accommodations. To suggest, then, that some glib caveat at the end of a letter that says, however, even though we don't have to provide anything to you, we're willing to discuss free or less costly alternatives cannot possibly meet the burden required, and Judge Ikuda, you pointed out the regulations require that they actually offer up those accommodations, as do the cases, the Hueso, I think I'm pronouncing that correctly, and the Bacon decisions we cited to you, put the burden on the accommodation to actually come up with and offer accommodations. That's all I have. Thank you, counsel. Thank you both for your arguments this morning. The case just argued to be submitted for decision.
judges: Thomas, Ikuta, Molloy